**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH P. CUVIELLO, *et al.*, | No. C-12-3034 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| CITY AND COUNTY OF SAN FRANCISCO, *et al.*, | |
| Defendants. | **(Docket No. 62)** |
| _____/ | |

## I.   INTRODUCTION

Defendants the City and County of San Francisco ("the City"), San Francisco Police Officer N. Yu, and San Francisco Park Ranger J. Mitra (collectively, "Defendants") bring the current motion to dismiss the First Amended Complaint for Injunctive and Declaratory Relief and Damages ("FAC") brought by Plaintiffs Joseph P. Cuviello, Deniz Bolbol, and Alex Felsinger. In their complaint, Plaintiffs plead seven different causes of action stemming from Defendants' enforcement of sections 7.08(d) and 7.15 of the San Francisco Park Code (hereinafter, "section 7.08(d)" and "section 7.15"), as well as their restricting Plaintiffs' free speech activities to a 20 feet by 20 feet corner of San Francisco's Union Square. Defendants urge the Court to dismiss all seven causes of action, with the exception of Plaintiffs' as-applied challenge to the enforcement of section 7.08(d) and their 42 U.S.C. § 1983 claim against the City to the extent it is based on such enforcement.

## II.   <u>REQUEST FOR JUDICIAL NOTICE</u>

Defendants request judicial notice of three documents: (1) a copy of San Francisco Park Code section 7.15; (2) a copy of San Francisco Park Code section 7.08 as it was in effect at the time of the incident in this case, prior to amendment pursuant to Ordinance No. 120819; and (3) a copy of Ordinance No. 120819.  Request for Judicial Notice ("RJN"), Docket No. 63.  Plaintiffs do not contest the validity of any of these documents.  *See* Pl.'s Opp'n, Docket No. 67.  "Municipal ordinances are proper subjects for judicial notice."  *Tollis v. County of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007).  Thus, the Court takes judicial notice of these three documents.

When section 7.08(d) was in effect, it read, in relevant part, that

> Union Square . . . [is a] frequent site[] for the issuance of permits involving large groups of people.  In order to prevent interference with the progress and enjoyment of these events, no person may engage in petitioning, leafletting, demonstrating or soliciting in th[is] park[] while an event is in progress for which a permit has been issued by the Recreation and Park Department except in [the] area[] described below as [a] public assembly area[].  No person shall be considered in violation of the prohibition contained in this subsection until he or she has been informed by a member of the San Francisco Police Department, a member of the Park Patrol, or a member of the Recreation and Park Department who displays proper identification of such employment that the event is being conducted pursuant to a valid permit or until the permit pursuant to which the event is being conducted has been shown to such person.  The area[] in which petitioning, leafletting, demonstrating and soliciting [is] prohibited during permitted events and the designated public assembly area[] during permitted events [is] described below.

> .   .   .

> **Union Square**—The prohibited area is the western half (Powell Street side) of the Square. The public assembly area is the eastern half (Stockton Street side) of the Square.

RJN Ex. B.  Section 7.08(d) was repealed following the filing of Plaintiffs' complaint.  *See* RJN Ex. C.

Section 7.15 reads, in full:

> Any person possessing a valid permit, which states that an area has been reserved for such person's use, has the exclusive right to use the area or facility specified in the permit for the time specified. It shall be unlawful for any person to refuse to leave an area or facility which has been reserved by a valid permit when asked to do so by the person or party displaying such permit, by a Recreation and Park Department employee, by a police officer, or by a member of the Park Patrol, and

United States District Court

For the Northern District of California

1    no person shall in any manner disturb or interfere with any person or
2    party occupying the area under such a permit, nor with the belongings
     of such person or party.

3  RJN Ex. A.

4              III.    **FACTUAL AND PROCEDURAL BACKGROUND**

5        Plaintiffs Cuviello, Bolbol, and Felsinger are animal rights activists affiliated with Humanity

6  Through Education, a San Francisco Bay Area group that demonstrates regarding the condition and

7  treatment of animals kept by circuses. FAC, Docket No. 52, ¶¶ 20-23. On September 2, 2011, the

8  Ringling Bros. and Barnum & Bailey Circus ("Ringling Bros.") held a promotional event in

9  downtown San Francisco at Union Square, a 2.6 acre public plaza. *Id.* ¶ 24. Plaintiffs and others

10 attended the event to hold signs, hold banners, and distribute leaflets regarding the circus's

11 mistreatment of animals. *Id.* ¶ 25.

12       When Plaintiffs Cuviello and Bolbol arrived, they were approached by Defendants Yu and

13 Mitra (collectively, the "Officers"), who told them that Ringling Bros. had a permit to use Union

14 Square and that, if Plaintiffs wished to demonstrate, they would have to do so in the designated free

15 speech box, an approximately 20 feet by 20 feet area cordoned off with bike racks in the

16 southeastern corner of Union Square. *Id.* ¶ 31. Yu told Cuviello and Bolbol that if they

17 demonstrated outside of this free speech area, they would be cited for violation of section 7.15. *Id.* ¶

18 33. Cuviello and Bolbol told Yu and Mitra that Union Square was a public forum and asked Yu to

19 call his watch commander to clarify the law. *Id.* ¶ 34. Cuviello and Bolbol then went up to the

20 northwestern area of the square and unfurled a banner reading "Ringling Bros. Beats Animals" so

21 that it was viewable by the public watching the circus's performance. *Id.* Yu and Mitra grabbed

22 hold of the banner and, despite Plaintiffs' protest to not touch their property, attempted to pull it

23 down while Cuviello and Bolbol were attempting to hold it up. *Id.* ¶ 35. Cuviello and Bolbol

24 struggled with Yu and Mitra for several minutes. *Id.* Mitra told Cuviello that the property was

25 "private" and that Plaintiffs were trespassing by demonstrating outside the free speech zone

26 designated by the officers. *Id.*

27       After this incident, Yu informed Cuviello and Bolbol they would be handcuffed and given a

28 citation for violation of San Francisco Park Code section 7.08(b), which prohibits demonstration that

substantially obstructs traffic of pedestrians or vehicles.  *Id.* ¶ 36.  Cuviello asked to see the San Francisco Park Code and Defendant Yu gave him a copy of excerpts of the code.  *Id.*  Yu then told Cuviello that he would only be cited if he continued to protest outside the free speech area.  *Id.* ¶ 39.  Cuviello responded that he would take the citation and Yu proceeded to write the citation, taking about fifteen minutes to do so.  *Id.* ¶ 40.  During this time, Plaintiff Felsinger arrived and began holding a sign about ten feet from where Cuviello was being cited.  *Id.* ¶ 42.  When Yu finished the citation, Cuviello observed that he was cited for violation of section 7.08(d).  *Id.* ¶ 43.  After Yu issued the citation, he and Mitra reiterated to Plaintiffs that they could only demonstrate in the designated free speech area.  *Id.* ¶ 46.  Yu then proceeded to cite Felsinger for violation of section 7.08(d).  *Id.*  Because Bolbol did not have identification, Yu told her she would not be cited and released, but instead taken into custody and transported to the police station for identification.  *Id.* ¶ 48.  Based on this threat of arrest, Bolbol ceased demonstrating and leafleting.  *Id.*

After Felsinger asked Yu to confirm that the demonstrators could only demonstrate in the free speech area, Felsinger and Yu looked at the Park Code together.  *Id.* ¶¶ 51-52.  Felsinger pointed out that the Park Code stated that demonstrations were allowed on the entire eastern side of Union Square.  *Id.* ¶ 52.  Felsinger and Cuviello then called over their attorney, Whitney Leigh, who agreed that section 7.08(d) permitted demonstrations in the entire eastern half of Union Square.  *Id.* ¶ 53.  Yu told Plaintiffs that "the Park" designated the free speech area and claimed that he never told Plaintiffs they had to be in the free speech area.  *Id.*  Bolbol then asked Yu if they had to remain in the free speech area, to which Yu responded "no comment" and then told Plaintiffs to wait for his sergeant to arrive.  *Id.* ¶ 54.  Based on Plaintiffs' concern that the event would be over by the time the sergeant arrived, Plaintiffs' attorney then asked Yu whether the demonstrators could go outside the free speech area.  *Id.* ¶ 55.  Yu responded that they could "as long as it doesn't interfere with the performance."  *Id.*  Plaintiffs and the other demonstrators then set up their banner behind the stage on the eastern side of Union Square and passed out leaflets on the eastern side of Union Square.  *Id.* ¶ 56.  Shortly thereafter, San Francisco Police Sergeant Ed Garcia arrived and confirmed that the Park Code allowed Plaintiffs to demonstrate in the eastern half of Union Square, not just the southeastern corner.  *Id.* ¶ 57.

**United States District Court**
For the Northern District of California

1    Plaintiffs allege that they were the only individuals restricted to the free speech area and to

2    the eastern half of Union Square, as other individuals, including Ringling employees engaged in pro-

3    circus speech and members of the public, were allowed to move freely through Union Square. *Id.* ¶

4    59.

5    Plaintiffs Cuviello, Bolbol, and Felsinger filed their initial complaint in this matter on June

6    12, 2012, asserting claims against the City, the San Francisco Recreation and Park Department,[1] Yu,

7    and Mitra. Docket No. 1. Defendants subsequently filed their first motion to dismiss on September

8    14, 2012. Docket No. 47. In lieu of responding, Plaintiffs filed their First Amended Complaint, the

9    subject of the current motion to dismiss, on September 28, 2012. FAC, Docket No. 52. Defendants'

10   current motion ensued. Docket No. 62.

11   Plaintiffs' First Amended Complaint includes the following seven causes of action, which

12   are brought by all Plaintiffs against all Defendants unless otherwise noted: (1) a § 1983 claim arising

13   under (a) the First Amendment right to free speech, (b) the Fourth Amendment right to be free from

14   unlawful seizure, false arrest, and excessive force, and (c) the Fourteenth Amendment right to equal

15   protection under the law; (2) conspiracy to violate the First, Fourth, and Fourteenth Amendments, as

16   well as article I, section 2(a) of the California Constitution pursuant to § 1983 and 42 U.S.C. § 1985;

17   (3) violation of liberty of speech pursuant to article I, section 2(a) of the California Constitution; (4)

18   a facial and as-applied challenge to section 7.08(d) against only the City; (5) a facial and as applied

19   challenge to section 7.15 against only the City; (6) violation of California Civil Code section 52.1;

20   and (7) illegal expenditure of funds pursuant to California Code of Civil Procedure section 526a

21   brought by only Felsinger. Docket No. 52, ¶¶ 99-133.

22   ### IV.   DISCUSSION

23   A.   Legal Standard

24   Under Federal Rules of Civil Procedure, Rule 12(b)(6), a party may move to dismiss based

25   on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A

26   motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See*

27   

28   

---

[1] Although not addressed by either party in their briefs, Plaintiffs' naming the Recreation and Park Department appears to be in error, as it is not a suable entity separate from the City.

**United States District Court**
For the Northern District of California

1   *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion,

2   a court must take all allegations of material fact as true and construe them in the light most favorable

3   to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are

4   insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

5   2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough

6   facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when

7   the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

8   defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see*

9   *also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to

10  a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted

11  unlawfully."  *Iqbal*, 556 U.S. at 678.

12  B.      Section 1983 (First Cause of Action)

13          Plaintiffs' first cause of action brought pursuant to 42 U.S.C. § 1983 consists of three

14  separate sub-claims arising under the First, Fourth, and Fourteenth Amendments to the U.S.

15  Constitution.  The Court addresses each in turn.

16          1.      First Amendment (§ 1983)

17          Following the parties' concessions, Plaintiffs' First Amendment sub-claim seeks damages

18  from all Defendants based on enforcement of section 7.08(d) and section 7.15, but declaratory and

19  injunctive relief only as to section 7.15 (section 7.08(d) has been repealed).  Defendants challenge

20  Plaintiffs' First Amendment sub-claim on the grounds that Plaintiffs lack standing to seek

21  declaratory or injunctive relief regarding enforcement of section 7.15; Plaintiffs fail to state a claim

22  regarding the facial or as-applied constitutionality of section 7.15; Plaintiffs have not pled sufficient

23  facts to state a claim against the City based on their relocation to the southeastern portion of Union

24  Square, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658

25  (1978); and Defendants Yu and Mitra are entitled to qualified immunity.

26          As confirmed at the hearing in this matter, Defendants do not contest this cause of action as

27  against the City to the extent it asserts a *Monell* claim and as-applied challenge based on

28

United States District Court

For the Northern District of California

1    enforcement of section 7.08(d).  *See* Defs.' Mot., Docket No. 62, at 1:25-27; Hr'g Tr., Docket No.

2    77, 3:22-24.

3              a.    Standing for Injunctive and Declaratory Relief

4         As a preliminary matter, Defendants assert that Plaintiffs lack standing to pursue injunctive

5    and declaratory relief with respect to section 7.15.

6                   1.    Legal Standard

7         In order to bring suit in an Article III court, a plaintiff must present a justiciable "case or

8    controversy."  *Benton v. Maryland*, 395 U.S. 784, 788 (1969).  To satisfy the "case or controversy"

9    requirement of Article III, a plaintiff must demonstrate that he has standing, which requires the

10   plaintiff have suffered "injury in fact," that the injury is "fairly traceable" to the actions of the

11   defendant, and that the injury will likely be redressed by a favorable decision.  *Lujan v. Defenders of*

12   *Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and alterations omitted).  Where a plaintiff seeks

13   injunctive relief, "[p]ast exposure to illegal conduct does not in itself show a present case or

14   controversy . . . if unaccompanied by any continuing, present adverse effects."  *O'Shea v. Littleton*,

15   414 U.S. 488, 495-96 (1974).  Rather, a plaintiff "must demonstrate that [he is] realistically

16   threatened by a *repetition* of the violation" at issue.  *Gest v. Bradbury,* 443 F.3d 1177, 1181 (9th Cir.

17   2006) (quotation marks and citations omitted, emphasis in original).  "'[S]ome day' intentions-

18   without any description of concrete plans, or indeed even any specification of *when* the some day

19   will be," do not suffice to provide standing for injunctive relief.  *See Lujan*, 504 U.S. at 564.  In

20   other words, "there must be a 'genuine threat of imminent prosecution [or enforcement].'"  *Thomas*

21   *v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc) (quoting *San*

22   *Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996)).

23        In evaluating the threat of future enforcement of a challenged law, courts consider (1)

24   "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question"; (2)

25   "whether the prosecuting authorities have communicated a specific warning or threat to initiate

26   proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute."

27

28

United States District Court

For the Northern District of California

*Id.*[2]  Where a plaintiff has alleged facts showing enforcement of a challenged law against him, he satisfies the second and third prong of this three-factor test.  *See Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 836-37 (9th Cir. 2012); *see also Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) (standing depends on whether (1) plaintiffs have shown "a reasonable likelihood that the government will enforce the challenged law against them"; (2) plaintiffs have "established, with some degree of concrete detail, that they intend to violate the challenged law"; and (3) "the challenged law is inapplicable to the plaintiffs, either by its terms or as interpreted by the government").  Government refusal to disavow future enforcement of a challenged law weighs in favor of granting standing.  *See American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991).

In *Thomas*, the plaintiffs were landlords with religious objections to unmarried cohabiting couples who sought to challenge laws prohibiting housing discrimination based on marital status. 220 F.3d at 1137.  The court found that the plaintiffs could not establish standing because they failed to make a sufficient showing under any of the three prongs of the standing test outlined above.  *Id.* at 1139-40.  While they stated that they would turn away potential renters who were unmarried couples, the court found this stated intent too speculative, as any violation of the law would be contingent on an unmarried couple at some point in the future seeking to rent from the plaintiffs.  *Id.* The court also found that there was neither an individual threat of prosecution, nor a history of the relevant agency vigorously enforcing the statute.  *Id.* at 1140.  In the twenty-five years the statutes had been on the books, there had been no criminal prosecutions and only two civil enforcement actions, both of which had been precipitated by complaints from actual tenants.  *Id.*

By way of contrast, in *Oklevueha*, the Ninth Circuit, in analyzing the first factor of the *Thomas* test requiring the plaintiffs articulate a "concrete plan" to violate the law in question, noted that the plaintiffs *had* sufficiently alleged a concrete plan because they had used marijuana in violation of the Controlled Substances Act and planned to continue to do so, alleging specific facts

---

[2]  While *Thomas* applied this test under a ripeness analysis, it indicated that this test is essentially the same when considering standing.  *See* 220 F.3d at 1138-39; *see also* Wright & Miller, 13B Fed . Prac. & Proc. Juris. § 3531.12 (3d ed. 2012) (noting blend of standing, ripeness, and mootness in assessing justiciability of claims for prospective relief).

regarding daily and semi-monthly marijuana usage. *Oklevueha*, 676 F.3d at 836. In analyzing the second factor, which requires a plaintiff to show the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, the court found that, even though the plaintiffs had never been arrested in connection with their marijuana consumption, they did not need to "allege a threat of future prosecution because the statute ha[d] already been enforced against them" by the government's seizure of their marijuana. *Id.* Lastly, as for the third factor, which requires a plaintiff show a history of past prosecution or enforcement under the challenged statute, the court found that, "because the CSA ha[d] already been enforced against Plaintiffs through the seizure of their marijuana," the plaintiffs fulfilled the third factor. *Id.* at 837.

### 2.   Application

Plaintiffs have alleged different operative facts with respect to Cuviello and Bolbol's standing to challenge section 7.15 (as opposed to Felsinger's standing). As for Cuviello and Bolbol, Plaintiffs cite to paragraphs 31 through 35 of their FAC, which state, in relevant part:

> 31.   PLAINTIFFS CUVIELLO and BOLBOL were approached by DEFENDANTS YU and MITRA and told that Ringling Bros. Circus had a permit to use the Square and if Plaintiffs wished to demonstrate they would have to do so in the designated free speech box, an approximately 20 feet by 20 feet area cordoned off with bike racks, in the Southeastern corner of the square, which had been set-up prior to Plaintiffs' arrival in the square. . . .
>
> .   .   .
>
> 33.   DEFENDANT YU told Plaintiffs that if they demonstrated outside the free speech area designated by he and DEFENDANT MITRA, they would be cited for violation of San Francisco Park Code 7.15 . . . .
>
> 34.   . . . . Plaintiffs then went up to the Northwestern area of the Square and unfurled their banner, that read "Ringling Bros. Beats Animals," so that it was viewable by the public watching the Circus' performance.
>
> 35.   DEFENDANTS YU and MITRA grabbed hold of Plaintiffs' banner and, despite Plaintiffs' protest to not touch their property, the officers grabbed Plaintiffs' banner and attempted to pull it down while Plaintiffs were attempting to hold it up. PLAINTIFFS CUVIELLO and BOLBOL, in their attempt to display their banner, struggled with YU and MITRA for several minutes. DEFENDANT MITRA told PLAINTIFF CUVIELLO that the property was "private" and that Plaintiffs were trespassing for demonstrating outside the free speech zone designated by the officers.

1   FAC ¶¶ 31, 33-35.

2       Here, section 7.15 contains essentially two independent restrictions; it provides that (1) it is

3   "unlawful for any person to refuse to leave an area or facility which has been reserved by a valid

4   permit when asked to do so" and (2) "no person shall in any manner disturb or interfere with any

5   person or party occupying the area under such a permit, nor with the belongings of such person or

6   party."  RJN Ex. A.

7       Construing the facts in the light most favorable to Plaintiffs, Defendants Yu and Mitra

8   enforced both restrictions against Plaintiffs.  As for the first restriction, Yu told Plaintiffs that they

9   could not demonstrate outside the free speech area and that they would be cited for violation of

10  section 7.15 if they demonstrated outside the free speech area, effectively a preemptive request for

11  Plaintiffs to leave the area outside the free speech zone.  FAC ¶¶ 31, 33.  Defendants Yu and Mitra

12  then tore down Plaintiffs' banner when they did demonstrate outside the free speech area, thereby

13  enforcing section 7.15.  *See* FAC ¶ 35; *see also* Black's Law Dictionary (9th ed. 2009)

14  ("enforcement" is "[t]he act or process of compelling compliance with a law . . . .").  Not only was

15  this an arguable enforcement of the first provision of section 7.15, but also an enforcement of the

16  second provision which provides that "no person shall in any manner disturb or interfere" with a

17  permitted event.  In this regard, this case resembles *Oklevueha*, 676 F.3d at 835, in which the seizure

18  of the plaintiffs' marijuana from FedEx was held to constitute enforcement, even though the

19  plaintiffs were not subject to prosecution.

20      In addition, the City has not disavowed its ability to employ section 7.15 to stop

21  demonstrators in the future, and thus section 7.15 could be similarly invoked in the future.  *See*

22  Defs.' Mot. 5-7; Defs.' Reply 1-4; *Am.-Arab Anti-Discrimination Comm.*, 970 F.2d at 508 (failure to

23  disavow weighs in favor of standing).

24      However, Plaintiffs must still "articulate[] a 'concrete plan' to violate the law in question."

25  *Thomas*, 220 F.3d at 1139.  In order to fulfil this first prong, a plaintiff must allege more than just

26  "[a] general intent to violate a statute at some unknown date in the future . . . ."  *Id.*  Here, Plaintiffs

27  do not even aver to a general intent to violate either restriction in section 7.15 in the future, let alone

28

United States District Court

For the Northern District of California

any concrete plans to do so.[3]  Rather, they generally allege that Cuviello and Bolbol are "members of Humanity through Education, a San Francisco Bay Area grassroots group dedicated to the humane treatment of animals," and that they speak out by "holding signs and banners, exhibiting video footage of various circuses' treatment of different animals, and offering leaflets with information about the condition and treatment of animals kept by circuses."  FAC ¶ 22.  In order to have standing, Plaintiffs must allege facts showing "concrete plans" to violate each restriction of section 7.15.  At a minimum, Plaintiffs must allege facts showing plans to conduct similar demonstrations in an area in San Francisco which has been reserved by permit, a requisite to the enforcement of section 7.15.  They have not done so.  Nor have they alleged facts suggesting that they have cancelled planned future demonstrations at permitted events for fear of enforcement of section 7.15.

Felsinger fails to an even greater extent to plead facts showing his intent to violate section 7.15; in fact, his allegations show he is *not* likely to violate section 7.15.  Felsinger's activities are alleged in the past tense: he "frequented Humanity Through Education demonstrations prior to moving out of state."  *Id.* ¶ 21.  As Felsinger has now moved out of state, it is highly unlikely that he will be able to allege facts showing concrete plans to violate section 7.15 in the future.  *See Lujan*, 504 U.S. at 564 ("some day" intentions without description of concrete plans or specification of when that some day will be do not suffice).  Moreover, unlike for Cuviello and Bolbol, section 7.15 was never enforced against Felsinger, as he did not arrive at the scene until after Yu threatened to enforce section 7.15 and subsequently did so by taking Cuviello's and Bolbol's banner.  *See id.* ¶¶ 33, 35, 42.  At best, Felsinger has pled that the second provision of section 7.15 was enforced against Cuviello and Bolbol, which does not lend much weight to a finding of standing for him.  *See Thomas*, 220 F.3d at 1140-41 (looking at record of enforcement of statute showing only two instances of civil enforcement).  He does "not claim that [he has] ever been threatened with

---

[3]  At the hearing in this matter Plaintiffs indicated that they had participated in similar demonstrations at circus events in the past, and that such events occur on a semi-regular basis in San Francisco.  *See* Hr'g Tr. 10:3-15, 17:25-18:7, 19:24-20:4.  However, these facts are not pled in their complaint.  *See* FAC.  Nor have Plaintiffs alleged section 7.15 was invoked in these instances or ever prevented them from protesting within areas subject to a permit.

1   prosecution, that prosecution is likely, or even that prosecution is remotely possible," as required by

2   the second prong of the three-factor test.  *See id.* at 1140.

3       Thus, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' claim for prospective

4   relief based on section 7.15.  The Court dismisses such prospective relief without prejudice and with

5   leave to amend.  Thus, even though Plaintiffs do not have standing to pursue declaratory or

6   injunctive relief with respect to their as-applied challenge, they do have standing to seek damages.

7           b.   Damages

8       Regardless of Plaintiffs' standing to seek prospective relief, the Court must still consider

9   whether they have adequately set forth a claim for damages based on violation of the First

10  Amendment.[4]  Here, Plaintiffs allege essentially three different actions on the part of Officers Yu

11  and Mitra that could constitute a violation of Plaintiffs' rights under the First Amendment:

12      1.   Plaintiffs allege that Officer Yu threatened them with citation and arrest if they

13           demonstrated outside of the designated free speech area.  *See* FAC ¶¶ 33, 39.

14      2.   Plaintiffs allege that Officers Yu and Mitra tore down their banner when they

15           demonstrated in the northwestern corner of Union Square.  *See id.* ¶¶ 34-35.

16      3.   Plaintiffs allege that they were cited with violation of section 7.08(d).  *See id.* ¶ 43.

17  Analysis of each action requires separate analysis of each Defendant's liability.

18      Moreover, Plaintiffs allege alternate theories for these actions:  first, that they constitute

19  enforcement of unreasonable, content-neutral time, place, or manner restrictions and, second, that

20  they were aimed at Plaintiffs because of the viewpoint of their speech, each of which requires

21  separate analysis.[5]  *See, e.g.*, FAC ¶ 89.

22  ───────────────

    [4]  The Court notes that Plaintiffs' facial and as-applied challenges should be considered as
23  claims for relief under their § 1983 cause of action.  *See Golden Gate Hotel Ass'n v. City & County
    of San Francisco*, 76 F.3d 386 (9th Cir. 1996) (analyzing a "42 U.S.C. § 1983 facial challenge").
24  *Compare San Remo Hotel, L.P. v. City & County of San Francisco, Cal.*, 545 U.S. 323, 334 n.12
    (2005) (complaint with separate counts for (1) facial and as-applied challenge; and (2) § 1983
25  challenge)

26      [5]  Plaintiffs separately allege a host of different and overlapping First Amendment theories,
    including that they were subject to a "prior restraint" of their speech (FAC ¶ 85); that they were
27  targeted because of "the content and/or viewpoint of" their speech (FAC ¶ 92); that they were
    retaliated against because of the exercise of their First Amendment rights (FAC ¶ 100); and that
28  Defendants interfered with their First Amendment rights (FAC ¶ 100).

United States District Court

For the Northern District of California

In *Moss v. U.S. Secret Serv.*, 675 F.3d 1213 (9th Cir. 2012) (*Moss II*), *amended by* __ F.3d __, 2013 WL 674059, at *19-21 (9th Cir. Feb. 26, 2013), the Ninth Circuit considered the distinction between a content-neutral policy as opposed to a viewpoint-based application of such a policy.  In *Moss*, the plaintiffs brought a *Bivens* action against two United States Secret Service agents assigned to protect President George W. Bush during a 2004 campaign appearance in Oregon.  675 F.3d at 1219-20.  The plaintiffs, anti-Bush demonstrators, alleged that they were subjected to a security perimeter that was not equally applied to pro-Bush demonstrators.  *Id.*  The court noted that, while content-neutral time, place, or manner "buffer zones" may be upheld where "content and viewpoint neutral," they are invalid where enforcement is based on viewpoint discrimination.  *See* 2013 WL 674059, at *20-21 (citing *Hill v. Colorado*, 530 U.S. 703 (2000)).

### 1.   Viewpoint Discrimination

Plaintiffs allege that they were targeted because of their anti-circus views in violation of the First Amendment.  *See* FAC ¶¶ 75, 80-81, 89, 92.  For either the City or the Officers to be liable for violation of Plaintiffs' First Amendment rights, there must first be "an underlying constitutional deprivation or injury."  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (municipal liability); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (officer liability).  If the Court finds that there is an underlying constitutional deprivation or injury, it still must consider whether such deprivation or injury was the result of an official custom or policy in order to hold the City liable under a *Monell* theory and whether the Officers are entitled to qualified immunity.

### (a)   Underlying Violation

It is well established that viewpoint discrimination by the government contravenes the First Amendment.  "'[V]iewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject."  *Giebel v. Sylvester*, 244

---

Rules invalidated as prior restraints "[a]ll . . . gave public officials the power to deny use of a forum in advance of actual expression."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).  Here, the enforcement actions taken against Plaintiffs were post-hoc regulation of speech.  Thus, the prior restraint doctrine is inapposite.

As for the other theories asserted by Plaintiffs, they are each variations on the same basic theme, which is the First Amendment's prohibition against government action taken on the basis of the content of speech.  Each requires that action be taken *because of* a party's speech.

**United States District Court**
For the Northern District of California

1   F.3d 1182 (9th Cir. 2001) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37,

2   59 (1983) (Brennan, J. dissenting)).  "A restriction on speech is viewpoint-based if (1) on its face, it

3   distinguishes between types of speech or speakers based on the viewpoint expressed; or (2) though

4   neutral on its face, the regulation is motivated by the desire to suppress a particular viewpoint."

5   *Moss II*, 675 F.3d at 1224.  To prevail in a viewpoint discrimination claim, a plaintiff must establish

6   that the government took action against it "*because of* not merely in spite of" its message.  *See Moss*

7   *v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (*Moss I*).

8         In *Moss v. U.S. Secret Service*, multiple iterations of the complaint were analyzed by the

9   Ninth Circuit, demonstrating just what sort of allegations are sufficient to demonstrate government

10  intent to target on the basis of viewpoint.  The first iteration of the complaint, was subject to the

11  methodology laid out in *Iqbal* in assessing a motion to dismiss, whereby

12        [A] court considering a motion to dismiss can choose to begin by
    identifying pleadings that, because they are no more than conclusions,

13  are not entitled to the assumption of truth.  While legal conclusions
    can provide the framework of a complaint, they must be supported by

14  factual allegations.  When there are well-pleaded factual allegations, a
    court should assume their veracity and then determine whether they

15  plausibly give rise to an entitlement to relief.

16  *Moss I*, 572 F.3d at 970 (quoting *Iqbal*, 129 S. Ct. at 1950).

17        First, the Ninth Circuit determined that "[t]he bald allegation of impermissible motive on the

18  [Secret Service] Agents' part, standing alone, [was] conclusory and [was] therefore not entitled to an

19  assumption of truth.  *Id.*  Moreover, it determined that an allegations of "officially authorized *sub*

20  *rosa* Secret Service policy of suppressing speech critical of the President" and "systematic viewpoint

21  discrimination at the highest levels of the Secret Service, without *any* factual content to bolster it"

22  were insufficient under *Iqbal*.  *Id.*  Second, the court "evaluate[d] Plaintiffs' specific factual

23  allegations to determine whether [it could] reasonably infer a First Amendment violation from those

24  facts."  *Id.*  The plaintiffs alleged that Secret Service Agents had "ordered the relocation of their

25  demonstration, but left a similarly situated pro-Bush demonstration undisturbed" and that diners and

26  guests inside an inn where the President was visiting "were not subjected to security screening or

27  asked to leave the premises, despite their close proximity to the President."  *Id.* at 971.  The court

28  determined that neither factual allegation was sufficient, as Plaintiffs alleged that they were moved

United States District Court

For the Northern District of California

1    "to a location situated a comparable distance from the Inn as the [pro-Bush] demonstrators,"

2    Plaintiffs failed to allege how the Secret Service Agents' actions were tied to those of the local

3    police, and the diners and guests inside the inn "did not engage in expressive activity of any kind

4    and were not located in the public areas outside of the Inn . . . ." *Id.*

5        In *Moss II*, the Ninth Circuit considered a subsequent iteration of the complaint in the same

6    case. In their revised complaint, the plaintiffs added additional factual allegations that "the agents

7    did indeed direct that the anti-Bush demonstration be moved farther from the Inn than the pro-Bush

8    demonstration" as well as "twelve detailed allegations, relying on published reports, of similar

9    instances of viewpoint discrimination against protestors expressing negative views of the President."

10   675 F.3d at 1224-26. This was found sufficient to state a claim of viewpoint discrimination.

11       Here, in addition to conclusory averments that sections 7.08(d) and 7.15 were "used for the

12   purpose of interfering with and preventing PLAINTIFFS' exercise of constitutionally-protected

13   rights of free expression," that Defendants "[r]etaliat[ed] against Plaintiffs for their exercise of their

14   First Amendment rights," and that Defendants "[s]ingl[ed] out Plaintiffs because of their viewpoints

15   and the perceived content of their expression" (*see* FAC ¶¶ 75, 80-81, 89, 92), Plaintiffs allege more

16   specific facts to substantiate their allegations of motive. First, they allege that "Ringling routinely

17   communicates and confers with municipalities about their desires and expectations at events it holds

18   on public property"; the communications included comments on "how to handle anticipated animal

19   rights' demonstrators and restrict free speech activity," including past instances in Oakland,

20   Stockton, and San Jose in which it "me[t] with public entities to establish specific security protocols

21   regarding animal rights demonstrators", "direct[ing] security to prohibit animal rights'

22   demonstrators from accessing certain areas normally open to the public" and "instigat[ing] the

23   unlawful arrests of animal rights' demonstrators." *Id.* ¶¶ 71-72. It is a reasonable inference that the

24   police in this instance acted at the request or behest of Ringling. Furthermore, Plaintiffs allege that,

25   while they were prohibited from demonstrating in the western half of Union Square, "other members

26   of the public [were allowed] to move freely throughout the Square, including Ringling employees

27   who were engaging in pro-Circus free speech activities without restriction" and "promot[ing] . . . the

28   Circus event that Plaintiffs sought to protest." *Id.* ¶¶ 50, 59, 73. While the latter allegation does not

**United States District Court**
For the Northern District of California

1    establish a Fourteenth Amendment violation as discussed below, it does provide some support of

2    Plaintiff's claim of viewpoint discrimination in meeting the pleading requirements of *Twombly* and

3    *Iqbal*.

4         While not as specific as the allegations in *Moss II*, the Court finds the allegations sufficient

5    to state a plausible claim of viewpoint discrimination.

6                              (b)    <u>City Liability</u>

7         In order to hold the City liable for the Officers' enforcement of the free speech area,

8    Plaintiffs must show under *Monell v. Department of Social Services of City of New York*, 436 U.S.

9    658, 691 (1978), that (1) "a city employee committed the alleged constitutional violation pursuant to

10   a formal governmental policy or a longstanding practice or custom which constitutes the standard

11   operating procedure of the local governmental entity"; (2) "the individual who committed the

12   constitutional tort was an official with final policy-making authority"; or (3) "an official with final

13   policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for

14   it." *See Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal citations and

15   quotation marks omitted). Plaintiffs "must also demonstrate that, through its deliberate conduct, the

16   municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs of Bryan*

17   *County, Okl. v. Brown*, 520 U.S. 397, 404 (1997).

18        Here, Plaintiffs' complaint does not contain any allegations suggesting that any viewpoint

19   discrimination against them was committed or ratified by an official with final policy-making

20   authority, thus leaving only the first potential basis for *Monell* liability. Pursuant to the first prong

21   of *Monell* liability, Plaintiffs only identify two potential policies as the basis for the City's

22   *Monell* liability – section 7.08(d) and section 7.15 – and do not identify any longstanding practice or

23   custom of viewpoint discrimination.

24        Regardless of whether section 7.08(d) or section 7.15 undergirds its analysis, the Court

25   cannot find an allegation of a policy, as identified by Plaintiffs, resulting in any unlawful viewpoint

26   discrimination. To succeed in their viewpoint discrimination claim under *Monell*, Plaintiffs must

27   demonstrate that either ordinance was the "moving force" behind such viewpoint discrimination.

28   However, the crux of Plaintiffs' viewpoint discrimination claim is that their treatment was

United States District Court

For the Northern District of California

1    "motivated by the desire to suppress a particular viewpoint." *Moss II*, 675 F.3d at 1224. Plaintiffs

2    have not alleged facts from which it can be inferred that either section 7.08(d) or section 7.15, which

3    are neutral on their face, were the moving force behind a desire to suppress Plaintiffs' viewpoint.

4    *Cf. Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1238 (9th Cir. 1994) (where one of multiple

5    municipal decision-makers acts on account of unconstitutional motive, insufficient to confer

6    municipal liability if other decision-makers not so motivated); *Valentino v. Village of South Chicago*

7    *Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (where official, using discretion conferred, acts based on

8    unconstitutional motive, no municipal custom). Thus, Plaintiffs have not set forth a basis for

9    holding the City liable for viewpoint discrimination.

10                         (c)    Qualified Immunity

11        Qualified immunity shields government officials from personal liability when they have not

12    violated a "clearly established" constitutional right. *Camreta v. Greene*, 131 S. Ct. 2020, 2030-31

13    (2011). In determining whether qualified immunity applies at the motion to dismiss stage, courts

14    consider (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional

15    right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged

16    misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (citing *Saucier v. Katz*, 533 U.S.

17    194, 201 (2001)). The second inquiry contains its own two-part inquiry, asking whether (1) "the law

18    governing the state official's conduct [was] clearly established"; and (2) "[u]nder that law [] a

19    reasonable state official [could] have believed his conduct was lawful." *Estate of Ford v. Ramirez-*

20    *Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). As for whether the law was clearly established, a case

21    directly on point is not required if existing precedent places the statutory or constitutional question

22    of the particular right at issue beyond debate. *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

23        Relevant to consideration of whether the official's conduct was "reasonable," qualified

24    immunity protects an officer from enforcing an unconstitutional ordinance when that ordinance has

25    been "duly promulgate by the city council and it [is] not so obviously unconstitutional as to require a

26    reasonable officer not to enforce it." *Acosta v. City of Costa Mesa*, 694 F.3d 960, 980 (9th Cir.

27    2012) (quotation marks and citation omitted). However, an officer may nevertheless be liable for

28    enforcement of an unconstitutional ordinance where it is "patently violative of fundamental

United States District Court

For the Northern District of California

1    constitutional principles" or where the officer "unlawfully enforces an ordinance in a particularly

2    egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of

3    the ordinance, . . . even if there is no clear case law declaring the ordinance or the officer's particular

4    conduct unconstitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1209-10 (9th Cir. 1994).

5           Here, regardless of whether the Officers were acting pursuant to section 7.08(d) and section

6    7.15 in targeting Plaintiffs because of their viewpoint, "it is axiomatic that the government may not

7    regulate speech based on its substantive content or the message it conveys." *Moss II*, 675 F.3d at

8    1228 (quotation marks, alteration, and citation omitted).  As discussed above, Plaintiffs have made

9    various allegations that the Officers "singl[ed] out Plaintiffs because of their viewpoints and the

10   perceived content of their expression" and provided specific examples of past collusion between

11   Ringling Bros. and other municipalities to target Plaintiffs because of their viewpoints.  *See* FAC ¶¶

12   50, 59, 71-73, 75, 80-81, 89, 92.  Regardless of whether a case is directly on point, "[i]t is beyond

13   debate that, particularly in a public forum, government officials may not disadvantage speakers

14   based on their viewpoint." *Moss II*, 675 F.3d at 1228.  Thus, Plaintiffs have alleged sufficient facts

15   to overcome qualified immunity on the part of the Officers.  "After discovery or trial, the evidence

16   could demonstrate that the [Officers] did not, in fact, act with viewpoint discriminatory intent or

17   that, notwithstanding some discriminatory motivation, they acted with [a constitutionally valid]

18   primary intent . . . and therefore would have taken the same actions absent any discriminatory

19   motive. In that case, they are, of course, free to renew their qualified immunity motion." *Id.* at 1228-

20   29.  At this juncture, however, qualified immunity does not prevent the claim of viewpoint

21   discrimination from proceeding.

22                  2.      Content-Neutral Time, Place, or Manner Restriction

23          In addition to viewpoint discrimination, Plaintiffs further assert Defendants' actions

24   constituted enforcement of unreasonable time, place, or manner restrictions.  In this regard, for

25   purposes of this motion, the Court construes the complaint as alleging the Officers' actions in

26   enforcing sections 7.08(d) and 7.15 without subjective intent to discriminate on the basis of

27   viewpoint.

28

The First Amendment permits content-neutral regulation of speech in the form of "time, place, or manner" restrictions. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Courts employ a three-part test for determining the legality of time, place, or manner restrictions, asking whether (1) the restrictions are justified without reference to the content of the regulated speech; (2) the restrictions are narrowly tailored to serve a significant government interest; and (3) the restrictions leave open ample alternative channels for communication of the information. *Id.* (citations omitted). It is the government's burden to justify a time, place, or manner restriction after a plaintiff demonstrates it impinges on First Amendment interests. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

For example, in *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 852 (9th Cir. 2004), the Ninth Circuit squarely considered a ban on demonstrating outside the entrance to a public facility save in certain designated "free expression zones," none of which was near an entrance to the building. While deciding the case under California law, it noted that both the California Constitution and the First Amendment require that "permissible restrictions on expression in public fora must be content-neutral, be narrowly tailored to serve an important government interest, and leave open ample alternative channels for the communication of the message," and thus considered the "free expression zones" in light of federal First Amendment precedent. *Id.* at 856, 858-63 (quotation marks and citation omitted). In considering the significance of the stated government interest of preventing congestion, the court noted that "the actual experience at the [facility] indicating how many protesters have shown up in the past is pertinent to judging the likely impact of allowing communication activity in the future," ultimately ruling that there was insufficient support in the record for this allegation. *Id.* at 859-60. Next, considering the specific orientation and use of the facility, the court determined that the restriction was not narrowly tailored. *Id.* at 861-63.

(a)     Threats of Arrest and Citation for Demonstrating Outside the Free Speech Area

First, Plaintiffs allege that Officer Yu threatened them with arrest and citation for demonstrating outside of the free speech area. *See* FAC ¶¶ 33, 39.

(i)      <u>Underlying Violation</u>

Applying the analysis set forth in *Kuba*, the 20-by-20 foot free speech area clearly impinges on First Amendment interests, as it allowed demonstration on only 0.4%[6] of the total acreage of Union Square and, to further isolate it, was surrounded by bicycle racks. *See* FAC, Docket No. 52, ¶¶ 24, 31. By way of contrast, section 7.08(d) allowed demonstration on the entire eastern half of Union Square, constituting 50% of the total acreage. Thus, Defendants shoulder the burden of demonstrating that the free speech area meets the three-part test for evaluating time, place, or manner restrictions. *See Clark*, 468 U.S. at 293 n.5. Viewing the complaint in Plaintiffs' favor, the restriction imposed on Plaintiffs was neither narrowly tailored nor did it leave open ample alternative channels for communication of information. The enforcement of such a free speech zone was not narrowly tailored, as it restricted Plaintiffs to 0.4% of the total plaza. It did not leave open ample alternative channels for the communication of information, as Plaintiffs were effectively sequestered from the vast majority of event spectators to whom they wished to communicate. Thus, under *Kuba*, and viewing the facts in Plaintiffs' favor, Plaintiffs have stated a claim that the restriction was not a reasonable time, place or manner restriction.

(ii)      <u>City Liability</u>

As discussed above, in order to hold the City liable for the Officers' enforcement of the free speech area, Plaintiffs must show under *Monell* that (1) "a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *See Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal citations and quotation marks omitted). Plaintiffs "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the

---

[6] Union Square is 2.6 acres, or 113,256 square feet. *See* FAC ¶ 24. The 400 square foot "free speech area" was thus approximately 0.4% of the total plaza.

United States District Court

For the Northern District of California

1    injury alleged." *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404

2    (1997).

3         As for the pleading standard for municipal liability, traditionally the rule in the Ninth Circuit

4    was that "a claim of municipal liability under section 1983 is sufficient to withstand a motion to

5    dismiss 'even if the claim is based on nothing more than a bare allegation that the individual

6    officers' conduct conformed to official policy, custom, or practice.'" *Karim-Panahi v. Los Angeles*

7    *Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988) (quoting *Shah v. County of Los Angeles*, 797 F.2d

8    743, 747 (9th Cir. 1986)). However, following the Supreme Court's decisions in *Twombly* and

9    *Iqbal*, courts in this circuit have moved from such a lax standard, instead requiring that plaintiffs

10   plead facts showing a plausible claim for municipal liability. *See AE ex rel. Hernandez v. County of*

11   *Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (suggesting that longstanding rule may have changed

12   post-*Iqbal*); *see, e.g.*, *Mateos-Sandoval v. County of Sonoma*, No. C-11-5817 TEH, 2013 WL

13   415600, at *4 (N.D. Cal. Jan. 31, 2013) ("*Karim–Panahi* has not been overruled, but the Ninth

14   Circuit has recognized that, under the Supreme Court's recent pleading jurisprudence, it is no longer

15   clear that, without more, an allegation that an officer's conduct 'conformed to official policy,

16   custom, or practice' continues to be sufficient to state a claim under Monell."); *Mirabal v. Smith*,

17   No. C-12-3075 SI, 2012 WL 5425407, at *2 (N.D. Cal. Nov. 6, 2012) ("It is not enough to allege

18   simply that a policy, custom, or practice exists that caused the constitutional violations."). The

19   precise parameters of what must be alleged are not well-defined, however.

20        In *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), the Ninth Circuit set forth a pleading

21   standard that appears to modify the traditional rule for stating a claim of municipal liability,

22   requiring that "to be entitled to the presumption of truth, allegations in a complaint . . . may not

23   simply recite the elements of a cause of action, but must contain sufficient allegations of underlying

24   facts to give fair notice and to enable the opposing party to defend itself effectively" and "the factual

25   allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not

26   unfair to require the opposing party to be subjected to the expense of discovery and continued

27   litigation." *See also AE ex rel. Hernandez*, 666 F.3d at 637 (quoting *Starr*, 652 F.3d at 1216).

28

1    Here, Plaintiffs do not argue that the constitutional violations were committed by or ratified

2    by an official with final policy-making authority, leaving only the policy basis for *Monell* liability.

3    *See* Pls.' Opp'n 22-24.  Plaintiffs' conclusory allegation that it was the "policy and/or custom" of the

4    City to restrict Plaintiffs to a free speech area is insufficient.  *See Starr*, 652 F.3d at 1216.  The

5    complaint must set forth some factual allegations that "plausibly suggest an entitlement to relief"

6    against the City.  Here, the 20 feet by 20 feet restriction imposed by Officer Yu was in *contravention*

7    of section 7.08(d).  Nothing suggests the limit imposed by Officer Yu was a matter of city policy.

8    *See Gillette*, 979 F.2d at 1346.  Indeed, Plaintiffs allege that "San Francisco Police Sergeant Ed

9    Garcia . . . confirmed that the Code did allow them to demonstrate on the Eastern half of the square,

10   not just in the Southeastern corner."  FAC, Docket No. 52, ¶ 57.  To the extent Plaintiffs were at

11   some point confined to the "free speech area," that confinement was not sanctioned by (and indeed

12   was in contravention of) section 7.08(d) and was quickly disavowed by Sergeant Garcia.  There is

13   no allegation the restriction has been imposed on a regular basis at Union Square.

14   For section 7.15, however, the analysis is more complicated.  First, unlike with section

15   7.08(d) or the alleged general policy of creating a free speech area for Plaintiffs, Plaintiffs allege

16   specific enforcement of the free speech area was based on section 7.15.  Specifically, the complaint

17   alleges that Officer Yu directly invoked section 7.15 when threatening Plaintiffs with citation for

18   demonstrating outside of the free speech area.  *See* FAC ¶ 33.  Construing the facts alleged in the

19   light most favorable to Plaintiffs, section 7.15 could thus and might be considered a moving force

20   behind enforcement of the free speech area.

21   The question is whether the Officers' putative enforcement of section 7.15 can be deemed

22   pursuant to municipal policy.  In this regard, it is necessary to compare the proper scope of section

23   7.15 with the actions taken by the Officers.

24   The interpretation of section 7.15 must be assessed in light of *Center for Bio-Ethical Reform,*

25   *Inc. v. Los Angeles County Sheriff Department*, 533 F.3d 780 (9th Cir. 2008).  In that case, the

26   plaintiffs presented an as-applied challenge to California Penal Code section 626.8 ("section

27   626.8"), which provided that:

28

(a) Any person who comes into any school building or upon any school ground, or street, sidewalk or public way adjacent thereto, without lawful business thereon, and whose presence or acts interfere with the peaceful conduct of the activities of the school or disrupt the school or its pupils or school activities, is guilty of a misdemeanor if he or she does any of the following:

(1) Remains there after being asked to leave by the chief administrative official of that school or his or her designated representative, or by a . . . sheriff or deputy sheriff . . . .

(2) Reenters or comes upon that place within seven days of being asked to leave by a person specified in paragraph (1).

(3) Has otherwise established a continued pattern of unauthorized entry.

This section shall not be utilized to impinge upon the lawful exercise of constitutionally protected rights of freedom of speech or assembly.

533 F.3d at 791.  The court noted that if an ordinance "would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'"  *Id.* at 787 (citations omitted).  However, "[a] statute that restricts speech only when it is disruptive because of its manner, not its content, is an example of content-neutral regulation that has been affirmed time and again."  *Id.* at 790.  Construing section 626.8 narrowly in order to preserve its constitutionality, as provided for under Supreme Court precedent, California case law, and the language of the statute itself, the court determined that section 626.8 was "intended to apply to manner rather than content of speech," noting that its use of the terms "presence," "acts," "interfere," and "disrupt" indicated that the statute was concerned with the physical aspects of the speaker's behavior, not the content of her speech.  *Id.* at 792.  The Ninth Circuit did not determine whether section 626.8 was unconstitutional as applied, finding that, based on the facts on the record, it had been misapplied by the individual defendants in the case based on the content of the plaintiffs' speech, which was outside the scope of the court's narrow construction of section 626.8.  *See id.* at 786, 793.

As discussed above, section 7.15 contains essentially two independent restrictions, providing that (1) it is "unlawful for any person to refuse to leave an area or facility which has been reserved by a valid permit when asked to do so" and (2) "no person shall in any manner disturb or interfere

United States District Court

For the Northern District of California

1    with any person or party occupying the area under such a permit, nor with the belongings of such

2    person or party."  RJN Ex. A.  The second restriction mirrors closely the statute at issue in *Center*

3    *for Bio-Ethical Reform*, in that it includes the language "interfere" and "disturb," which can and

4    should be construed pursuant to *Center for Bio-Ethical Reform* as applying only to the physical

5    aspects of the speaker's behavior, not the content.  So construed, the Court finds that the second

6    restriction in section 7.15 is a lawful time, place, or manner restriction.  To establish an

7    unconstitutional municipal policy, Plaintiffs must show there was a practice of police in

8    misconstruing section 7.15 and that the City was deliberately indifferent to the fact that it was being

9    repeatedly employed to restrict demonstrators to unconstitutionally restrictive free speech areas.  *See*

10   533 F.3d at 786, 793.  Plaintiffs have not done so.  No *Monell* claim lies to the extent enforcement

11   was based on the second provision of section 7.15.

12         On the other hand, unlike the statute at issue in *Center for Bio-Ethical Reform*, the first

13   restriction in section 7.15, stating that it is "unlawful for any person to refuse to leave an area or

14   facility which has been reserved by a valid permit when asked to do so," cannot be construed to

15   address only the manner of speech.  It does not contain words like "presence," "acts," "interfere,"

16   and "disrupt" which are capable of being construed as aimed at conduct rather than the content of

17   speech.  *See Center for Bio-Ethical Reform*, 533 F.3d at 792.  The first restriction instead is akin to

18   the heckler's veto discussed in *Center for Bio-Ethical Reform*, in that it "would allow or disallow

19   speech depending on the reaction of the audience."  533 F.3d at 787.  The first provision of section

20   7.15 effectively gives unfettered discretion to the permit holder and law enforcement to banish

21   others' speech because it is disfavored by the permit holder.  A heckler's veto is presumptively

22   unconstitutional.  *See, e.g.*, *Bachellar v. Md.*, 397 U.S. 564, 567 (1970) ("the public expression of

23   ideas may not be prohibited merely because the ideas are themselves offensive to some of their

24   hearers or simply because bystanders object to peaceful and orderly demonstrations") (quotation

25   marks and citations omitted).

26         While many cases discussing similar heckler's vetoes find them to be unconstitutional

27   precisely because they enable content-based discrimination, the Ninth Circuit has found them to be

28   unconstitutional even when applied as content-neutral time, place, or manner restrictions.  In

1    *Gathright v. City of Portland*, 439 F.3d 573, 575 (9th Cir. 2006), the court held unconstitutional a

2    substantially similar city ordinance providing that "it is unlawful for any person unreasonably to

3    interfere with a permittee's use of a Park" and related policy allowing permittees to "order a person

4    to leave an open event when that person 'unreasonably' interferes with the permittee's use of the

5    licensed space."  Assuming the limitation was a content-neutral restriction on speech, the court

6    nevertheless concluded that "the policy of allowing permittees unfettered discretion to exclude

7    private citizens on any (or no) basis is not narrowly tailored to the City's legitimate interest in

8    protecting its permittees' right [to not be forced to include the words of a speaker expressing a

9    message not of their choosing]."  *Id.* at 577 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791

10   (1989); *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 579

11   (1995)).

12        Like the ordinance in *Gathright*, the first restriction in section 7.15 "allows permittees

13   unfettered discretion to exclude private citizens on any (or no) basis."  439 F.3d at 577.  It similarly

14   contains no limitation on the discretion of the permittees, police officers, or RPD employees to

15   exclude individuals.  Thus, like the ordinance in *Gathright*, the restriction in section 7.15 providing

16   that  it is "unlawful for any person to refuse to leave an area or facility which has been reserved by a

17   valid permit when asked to do so" permits an unconstitutional heckler's veto.  Here, as discussed

18   above in the section on standing, Plaintiffs have sufficiently alleged that the first restriction in

19   section 7.15 was the moving force behind Defendant Yu's threat of citation, as Defendant Yu

20   invoked section 7.15 in his threat.  Thus, Plaintiffs have pled sufficient facts to proceed under

21   *Monell* against the City based on Defendant Yu's threat of citation to the extent that threat was

22   based on the first provision of section 7.15.

23                          (iii)    Officer Liability

24        Next, the Court must consider whether Officers Yu and Mitra may be held liable for

25   threatening to cite Plaintiffs with violation of section 7.15 for demonstrating outside the free speech

26   area.  Plaintiffs only allege that Officer Yu threatened them with citation and arrest for

27   demonstrating outside the free speech area.  No such allegation is made against Officer Mitra, and

28   thus Officer Mitra may not be held liable for such threats.  As discussed above, Plaintiffs have set

United States District Court

For the Northern District of California

1    forth the underlying violation of the First Amendment; thus the Court need only address whether

2    enforcement of sections 7.08 and 7.15 for demonstration outside the prescribed free speech area

3    violated clearly established First Amendment law and whether a reasonable officer could have

4    believed so enforcing the restricted free speech area was lawful.  *See Estate of Ford*, 301 F.3d at

5    1050; *Grossman*, 33 F.3d at 1209-10.

6          First, the Court turns to whether the law making the restriction unconstitutional was clearly

7    established as of the date of the alleged violation, September 2011.  FAC ¶ 24.  The three-part test

8    regarding reasonable time, place, or manner restrictions dates back to at least *Clark v. Community*

9    *for Creative Non-Violence*, 468 U.S. 288, 293 (1984), nearly thirty years before the alleged violation

10    in this case.  As noted above, in *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850 (9th Cir. 2004), the Ninth

11    Circuit determined that an even more permissive time, place, or manner restriction was

12    unconstitutional.  Although the facts of *Kuba* are not identical to those in this case, its "premise has

13    clear applicability in this case"; this suffices to demonstrate that the law was clearly established at

14    the time of the alleged violation.  *See Hope v. Pelzer*, 536 U.S. 730, 743 (2002).

15          As for the reasonableness of enforcing the free speech area, it would have been clear to a

16    reasonable police officer in the position of Defendant Yu  that limiting individuals' right to

17    demonstrate to an area less than one percent the size of the area actually permitted under section

18    7.08(d) was unlawful.  In this regard, a reasonable law enforcement officer should know that such a

19    draconian restriction on speech violates the First Amendment.  *See Galvin v. Hay*, 374 F.3d 739, 746

20    (9th Cir. 2004) (where invalidity of imposing the restriction is self-evident, it is not reasonable).

21          Nevertheless, Officer Yu could seek to argue that he was simply enforcing section 7.08(d)

22    and section 7.15.  Even assuming that Yu was attempting to enforce section 7.08(d) by restricting

23    Plaintiffs to the free speech area, he did so "in a manner which a reasonable officer would recognize

24    exceeds the bounds of [section 7.08(d)]" which only prohibited demonstration in the western half of

25    Union Square; nothing in section 7.08(d) authorized restricting the demonstration to a 20-by-20 foot

26    free speech area surrounded by bicycle racks.  *See Grossman*, 33 F.3d at 1209-10.  Thus, section

27    7.08(d) offers no shelter to Officer Yu.

28

United States District Court

For the Northern District of California

1    Section 7.15, on the other hand, is more amorphous.  Any application of the second

2  restriction in section 7.15, which, like the statute in *Center for Bio-Ethical Reform*, applies only to

3  the *manner* of speech, to set up a *place* restriction would be a misapplication of the law, and thus

4  arguably would not provide Officer Yu the shelter of qualified immunity.  Yet, the statutory

5  construction this Court places on the second restriction of section 7.15 is subtle;  no court has

6  previously applied *Center for Bio-Ethical Reform* to this provision.  Hence, the law in this regard

7  was not clearly established.

8    The first restriction in section 7.15 is broader, making it unlawful for an individual to refuse

9  to leave if asked to do so by a permit holder or law enforcement officer, without providing any

10  standards for making such a request.  As discussed above, such an ordinance, without any limiting

11  construction, constitutes an unconstitutional heckler's veto.  Thus, the question remains whether

12  enforcement of an ordinance permitting a heckler's veto was so "patently violative of fundamental

13  constitutional principles" that a reasonable officer in Yu's position could not have believed his

14  conduct was lawful.  *See Grossman*, 33 F.3d at 1209-10.

15    Although the basic principle of First Amendment law prohibiting giving license to a

16  heckler's veto was well established as noted above, the First Amendment does permit private parties

17  to take over public fora for private events and control, to a certain extent, speech at such events.

18  *See, e.g.*, *Hurley v. Irish American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 581

19  (1995) (prohibiting enforcement action against parade organizer for excluding float); *Sistrunk v. City*

20  *of Strongsville*, 99 F.3d 194, 200 (6th Cir. 1996) (permitting private, ticketed political event on

21  public property to exclude supporter of political opponent); *Villegas v. Gilroy Garlic Festival Ass'n*,

22  541 F.3d 950, 956 (9th Cir. 2008) ("it is generally not a constitutional violation for a police officer

23  to enforce a private entity's rights").  In evaluating a content-neutral time, place, or manner

24  restriction, even one permitting a heckler's veto,  the line of constitutionality is not a bright one and

25  may entail a fact-intensive inquiry based, *e.g.*, on past experiences with use of the space.

26    Thus, enforcement of section 7.15 in this case was not so "patently violative" of the

27  Constitution as to render such enforcement unreasonable.  *Grossman*, 33 F.3d at 1209-10.  Thus,

28  Officer Yu is entitled to qualified immunity on the basis of his enforcement of section 7.15.  To the

1   extent his actions in restricting Plaintiffs to the 20 feet by 20 feet area were an attempt to enforce

2   section 7.08(d), no qualified immunity applies.

3                           (b)      Tearing down Banner

4        Next, the Court considers the conduct of the Defendant Officers in tearing down Plaintiffs'

5   banner as a content-neutral time, place, or manner restriction.  In this instance, the time, place, or

6   manner restriction could conceivably be an enforcement action against *either* the act of

7   demonstrating outside the 20 feet by 20 feet free speech area *or* demonstrating in the western half of

8   Union Square, as Plaintiffs were demonstrating in the northwestern corner of Union Square when

9   the Officers tore down their banner.  It also can be construed as enforcement of section 7.15.

10                           (i)      Underlying Violation

11       As discussed above, enforcement of the 20 feet by 20 feet free speech area would constitute

12  an unreasonable time, place, or manner restriction, violating the First Amendment.  As to

13  enforcement of section 7.08(d)'s prohibition on demonstrations outside the eastern half of Union

14  Square, given the broader area in which protests were permitted under section 7.08(d) as correctly

15  applied, it is not so clear without a factual record whether section 7.08(d) is constitutional.  As such

16  restriction differs from that in *Kuba*, 387 F.3d at 859-63, there are a number of facts that may inform

17  its constitutionality which would render *Kuba* distinguishable.  Drawing all inferences in Plaintiffs'

18  favor, the Court cannot hold section 7.08(d) is so decidedly constitutional as to preclude Plaintiffs'

19  claim at this juncture.

20                           (ii)      City Liability

21       Again, the Court considers whether the City's policies may serve as a vehicle for the City's

22  liability under *Monell*.  To the extent the Officers tearing down Plaintiffs' banner constituted

23  enforcement of the 20 feet by 20 feet free speech area, the analysis is the same as for its liability

24  based on Officer Yu's threat of citation for demonstration outside the free speech area.  There is no

25  basis for *Monell* liability as there is no allegation establishing this conduct was pursuant to City

26  policy.

27       To the extent the Officers tearing down Plaintiffs' banner constituted enforcement of section

28  7.08(d)'s restriction to the western half of Union Square, unlike the enforcement of the 20 feet by 20

United States District Court

For the Northern District of California

1   feet free speech area, section 7.08(d) directly prohibits demonstration in the western half of Union

2   Square.  A city ordinance constitutes municipal policy under *Monell.  See Monell*, 436 U.S. at 690.

3   Furthermore, that the Officers ultimately cited Plaintiffs for violation of section 7.08(d) suggests that

4   it may have been the moving force behind their act of tearing down Plaintiffs' banner.  To this

5   extent, Plaintiffs have stated a *Monell* claim under section 7.08(d).

6          As alleged, section 7.15 cannot be said to be the moving force behind enforcement of any

7   restriction to the western half of Union Square.  Officer Yu invoked section 7.15 in the context of

8   restricting Plaintiffs to the 20 feet by 20 feet free speech area, not the western half of Union Square;

9   but neither Officers Yu or Mitra cited section 7.15 in tearing down the banner.  Instead, after tearing

10  the banner down, they said Plaintiffs were trespassing by going outside the free speech area.  FAC ¶

11  35.  They were then threatened with arrest and citation under section 7.08(b).  *Id.* at ¶ 36.  Since,

12  under the allegations of the FAC, section 7.15 was not the moving force in tearing down the banner,

13  no *Monell* claim is stated under section 7.15.

14                          (iii)    Officer Liability

15         To the extent their tearing down Plaintiffs' banner constituted enforcement of the 20 feet by

16  20 feet free speech area, analysis of the Officers' qualified immunity is the same as for Officer Yu's

17  threat of citation for demonstrating outside the 20 feet by 20 feet free speech area.  There is no

18  qualified immunity.

19         On the other hand, to the extent their tearing down Plaintiffs' banner constituted enforcement

20  of the restriction against demonstration in the western half of Union Square, the analysis diverges.

21  For Officers Yu and Mitra to be liable for enforcement of section 7.08(d), the ordinance must be

22  "patently violative" of the First Amendment pursuant to the second prong of the qualified immunity

23  analysis.  *See Grossman*, 33 F.3d at 1209-10.  As noted above, the facts and circumstances of section

24  7.08(d) differ from the restrictions in *Kuba.  See Blair v. City of Evansville, Ind.*, 361 F. Supp. 2d

25  846, 864 (S.D. Ind. 2005) (distinguishing case involving 500-foot buffer zone for Vice President

26  visit with case involving 300-foot buffer for abortion clinic to find that enforcement of 500-foot

27  buffer zone was not patently violative of the law).  Its unconstitutionality is not clear without a

28  developed factual record.  At the very least, section 7.08(d) is not "patently violative" of the First

1   Amendment.  Thus, Defendants Yu and Mitra are entitled to qualified immunity for their

2   enforcement of this ordinance.

3        As it is evident from the allegations of the FAC that section 7.15 was not the moving force

4   behind the tearing down of the banner, the Court need not address qualified immunity on that basis.

(c)      <u>Citation</u>

6        The last action underlying Plaintiffs' First Amendment claim is their ultimate citation for

7   violation of section 7.08(d) by Officer Yu.  The analysis of whether Defendants may be held liable

8   on account of this citation follows from the above discussion.

(i)      <u>Underlying Violation</u>

10       The analysis of whether citation for violation section 7.08(d) constituted an unreasonable

11  time, place, or manner restriction is identical to the analysis of whether tearing down Plaintiffs'

12  banner due to their demonstrating in the western half of Union Square violated the First

13  Amendment.  For the reasons stated above, drawing the facts and inferences in Plaintiffs' favor, they

14  have stated a First Amendment claim for purposes of this motion to dismiss.

(ii)      <u>City Liability</u>

16       With the citation implicitly based on section 7.08(d), there is a reasonable inference that the

17  ordinance is the moving force behind the citation.  Defendants do not contest this source of *Monell*

18  liability in their motion to dismiss.  *See* Defs.' Mot. 1:25-2:1.

(iii)      <u>Officer Liability</u>

20       The analysis of the Officers' qualified immunity for enforcement of section 7.08(d) is no

21  different than that for their tearing down Plaintiffs' banner for demonstrating in the western half of

22  Union Square.  Namely, section 7.08(d) is not patently violative of the Constitution, and thus an

23  officer conducting content-neutral enforcement thereof would be entitled to qualified immunity to

24  the extent Defendants were properly enforcing section 7.08(d).  To the extent they were misapplying

25  section 7.08(d) by enforcing the 20 feet by 20 feet free speech area, there is no qualified immunity.

26       2.      <u>Fourth Amendment (§ 1983)</u>

27       At the hearing in this matter, Plaintiffs confirmed that they are not pursuing their Fourth

28  Amendment sub-claim on the grounds of excessive force, but rather false arrest.  *See also* Defs.'

United States District Court

For the Northern District of California

1  Mot., Docket No. 62, at 14-15 (argument against excessive force); Defs.' Reply, Docket No. 69, at

2  11 n.5 (noting Plaintiffs' failure to address argument against excessive force).  Thus, the Court

3  **GRANTS** Defendants' motion to dismiss Plaintiffs' Fourth Amendment excessive force sub-claim

4  and dismisses this theory with prejudice and without leave to amend.

5      Defendants argue that Plaintiffs' Fourth Amendment unlawful seizure (*i.e.* false arrest)

6  theory fails, as Yu had probable cause to cite Plaintiffs and, even if he did not have probable cause,

7  his actions were protected by qualified immunity.  However, the Court need not reach these

8  arguments, because the complaint does not allege that Plaintiffs were seized within the meaning of

9  the Fourth Amendment.  *See* FAC, Docket No. 52.  "[A] person is 'seized' only when, by means of

10 physical force or a show of authority, his freedom of movement is restrained."  *U.S. v. Mendenhall*,

11 446 U.S. 544 (1980).  Plaintiffs' complaint only alleges that they were threatened with arrest if they

12 "continued demonstrating outside the barricaded 'free speech' area . . . ." and that Yu told Plaintiffs

13 they would be handcuffed.  FAC, Docket No. 52, ¶¶ 36, 39.  As alleged, Plaintiffs' only limitation

14 on movement is that, if they wanted to demonstrate, they had to remain within the free speech area.

15 There was no overarching restraint on Plaintiffs' freedom of movement sufficient to state a claim for

16 unlawful seizure within the meaning of the Fourth Amendment.  Cuviello and Felsinger were cited.

17 Bolbol was threatened with arrest but never arrested.  Accordingly, the Court **GRANTS** Defendants'

18 motion to dismiss Plaintiffs' Fourth Amendment unlawful seizure sub-claim.  The Court dismisses

19 Plaintiffs' unlawful seizure sub-claim without prejudice and with leave to amend.

20      3.      Fourteenth Amendment (§ 1983)

21      Plaintiffs' Fourteenth Amendment sub-claim is based on the equal protection clause, which

22 is "essentially a direction that all persons similarly situated should be treated alike."  *City of*

23 *Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  Enforcement of an otherwise

24 valid law neutral on its face violates the equal protection clause if it (1) has a discriminatory effect;

25 and (2) is motivated by a discriminatory purpose.  *Wayte v. U.S.*, 470 U.S. 598, 608 (1985).  To the

26 extent Plaintiffs seek to enjoin the alleged selective enforcement, they must "demonstrate the . . .

27 misconduct is part of a policy, plan, or a pervasive pattern."  *Rosenbaum v. City & County of San*

28 *Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007).

**United States District Court**
For the Northern District of California

1      Here, Plaintiffs have not alleged facts demonstrating a discriminatory effect.  A

2  discriminatory effect is typically established by showing the plaintiff was treated unfavorably

3  compared to others who are similarly situated.  *See id.*  Plaintiffs allege in their complaint and argue

4  in their opposition brief that they were treated differently from the members of the public in

5  attendance at the Ringling Bros. event and from Ringling Bros. itself.  *See* FAC, Docket No. 52, ¶

6  59; Pl.'s Opp'n, Docket No. 67, at 22:6-11.  For purposes of an equal protection claim, however,

7  these are not Plaintiffs' comparators.  Ringling Bros. is a private entity that held a permit to stage an

8  event, not members of the public without a permit like Plaintiffs.  Further, Plaintiffs do not allege

9  that there were other members of the public (without a permit) engaging in the same sorts of

10  activities as Plaintiffs, *e.g.*, leafleting, demonstrating, unfurling banners, were treated more

11  favorably than Plaintiffs.  In short, Plaintiffs did not allege that others who were similarly situated to

12  Plaintiffs were not cited with violation of section 7.08(d) or 7.15.

13      As Plaintiffs have not met their burden of showing discriminatory effect, the Court need not

14  address whether Plaintiffs have sufficiently alleged discriminatory purpose or whether Defendants'

15  selective enforcement is part of a policy, plan, or pervasive pattern.  The Court **GRANTS**

16  Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment equal protection sub-claim.  The

17  dismissal is without prejudice.

18  C.      Conspiracy (Second Cause of Action) (§§ 1983 and 1985)

19      Plaintiffs' second cause of action states a claim for conspiracy to violate Plaintiffs' civil

20  rights pursuant to 42 U.S.C. § 1985 and 42 U.S.C. § 1983.  *See* FAC, Docket No. 52, ¶¶ 103-09.

21      To state a claim for conspiracy under § 1985

22          a complaint must allege that the defendants did (1) 'conspire . . .' (2)
            'for the purpose of depriving, either directly or indirectly, any person
23          or class of persons of the equal protection of the laws, or of equal
            privileges and immunities under the laws.'  It must then assert that one
24          or more of the conspirators (3) did, or caused to be done, 'any act in
            furtherance of the object of (the) conspiracy,' whereby another was
25          (4a) 'injured in his person or property' or (4b) 'deprived of having and
            exercising any right or privilege of a citizen of the United States.'

26

27  *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971) (quoting 42 U.S.C. § 1985(3)).  "The language

28  requiring intent to deprive of equal protection, or equal privileges and immunities, means that there

**United States District Court**
For the Northern District of California

1   must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

2   conspirators' action." *Id.* at 102.

3        On the other hand, in a § 1983 conspiracy claim

4            the plaintiff must show that the conspiring parties reached a unity of
            purpose or a common design and understanding, or a meeting of the

5            minds in an unlawful arrangement.  To be liable, each participant in
            the conspiracy need not know the exact details of the plan, but each

6            participant must at least share the common objective of the conspiracy.
            A defendant's knowledge of and participation in a conspiracy may be

7            inferred from circumstantial evidence and from evidence of the
            defendant's actions.

8

9   *Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999).  Allegations of conspiracy

10  must still meet the *Iqbal* pleading standard, such as by "defin[ing] the scope of any conspiracy . . .,

11  what role [a conspirator] had, or when or how the conspiracy operated."  *Lacey v. Maricopa County*,

12  693 F.3d 896, 937 (9th Cir. 2012) (en banc).

13       In their complaint, Plaintiffs allege that Defendants "conspired to adopt the free speech area

14  restriction beyond what the Park Code prescribed and confin[e] Plaintiffs within a barricaded area at

15  the Southeastern corner of Union Square . . . ."  FAC, Docket No. 52, ¶ 105.  Such a bald assertion,

16  without more, does not suffice to allege a conspiracy under either § 1983 or § 1985.  As to § 1985,

17  Plaintiffs do not allege racial or other class-based invidious discrimination.  As to § 1983, Plaintiffs

18  do not allege any specific facts showing a unity of purpose among co-conspirators, the scope of the

19  conspiracy, what role each Defendant had in the conspiracy, or how the conspiracy operated.  *See*

20  *Lacey*, 693 F.3d at 937.

21       Thus, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' second cause of action

22  for conspiracy.  As Plaintiffs indicated at the hearing in this matter that they have obtained evidence

23  demonstrating a coordinate plan to target them based on their protected speech, the Court dismisses

24  their second cause of action without prejudice and with leave to amend to plead facts showing the

25  existence of a conspiracy.

26  D.    Article I, Section 2(a) of the California Constitution (Third Cause of Action)

27       Plaintiffs' third cause of action asserts that Defendants violated Plaintiffs' free speech rights

28

1  under article I, section 2(a) of the California Constitution.  *See* FAC ¶¶ 110-12.  Defendants seek

2  dismissal of the claim, contending there is no private right of action.

3         In *Degrassi v. Cook*, 29 Cal. 4th 333, 336 (2002), the California Supreme Court declined to

4  extend a private right of action for damages based on violation of article I, section 2(a) of the

5  California Contstitution.  The plaintiff in *Degrassi* served as a member of the Glendora City Council

6  from 1994 to 1999.  *Id.* at 335.  During that time, she was subjected to a harassing course of conduct

7  by other members of the city council, city employees, the city's attorneys, and certain private

8  individuals as a result of their opposition to her political views.  *Id.* at 336.  For example, she was

9  sued for defamation by certain private individuals as a result of comments made at a city council

10 meeting, yet excluded from closed city council meetings discussing whether or not to provide her

11 legal counsel in defense of the lawsuit.  *Id.*  In addition, she alleged that she was threatened with

12 civil lawsuits or "other unpleasant consequences" unless she refrained from acting on or discussing

13 matters of public interest relating to the city.  *Id.* at 337.  She alleged that various defendants

14 suppressed information in retaliation for her views in order to force her to resign.  *Id.*

15        The California Supreme Court held that, based on the facts at hand, no private right of action

16 for damages existed for violation of article I, section 2(a) of the California Constitution.  The Court

17 found that neither the language of article I, section 2(a), which was passed by referendum in 1974,

18 nor the drafting history and voter information materials indicated an intent to authorize or foreclose

19 damages.  *Id.* at 338-40.  It also noted that article I, section 2(a) does not contain guidelines,

20 mechanisms, or procedures from which a damages remedy might be inferred and that relevant

21 common law history did not suggest an intent to provide such a damages remedy.  *Id.* at 341-42.

22        Having found no evidence of an intent behind article I, section 2(a) to imply private right of

23 action for damages, the Court looked to the factors from *Katzberg v. Regents of University of*

24 *California*, 29 Cal. 4th 300, 324 (2002), to determine whether to recognize a constitutional tort

25 action for damages for such violation.  *Degrassi*, 29 Cal. 4th at 342.  In *Katzberg*, the Court

26 identified four factors for a court to consider in determining whether to recognize a constitutional

27 tort: (1) "the adequacy of existing remedies"; (2) "the extent to which a constitutional tort action

28 would change established tort law"; (3) "the nature of the provision and the significance of the

United States District Court

For the Northern District of California

purpose that it seeks to effectuate"; and (4) "whether any special factors would counsel hesitation in recognizing such a damages action," such as "deference to legislative judgment, avoidance of adverse policy consequences, considerations of governmental fiscal policy, practical issues of proof, and competence of courts to assess particular types of damages." 29 Cal. 4th at 325-29.  The *Degrassi* Court determined that the first, second, and fourth *Katzberg* factors weighed against recognition of a constitutional tort based on the facts at hand.  29 Cal. 4th at 342-43.  First, the Court determined that the plaintiff had meaningful alternative remedies, in that she could have sought relief under either Code of Civil Procedure section 1085 or the Ralph M. Brown Act.  *Id.* at 342.  As for the second factor, the Court determined that California law put forth by the plaintiff did not recognize a constitutional tort action for damages.  *Id.* at 343.  Third, it noted that "[a]dmittedly, the free speech clause reflects an important and fundamental interest," but held that when the first two factors "do not militate in favor of recognizing a constitutional tort action, the relative importance of the right, standing alone, is not a factor of great significance."  *Id.*  Lastly, the Court expressed concern that the threat of damages in that action might chill the political process, "subject[ing] to post hoc judicial scrutiny and assessment of damages the kind of political differences, squabbles, and perceived slights that are inherent in a representative government body such as a city council."  *Id.* at 343-44.

As Plaintiffs admitted at the hearing in this matter, no court applying the *Katzberg* factors has yet to recognize a private right of action for damages under article I, section 2(a) since *Degrassi*.  *See Motevalli v. Los Angeles Unified Sch. Dist.*, 122 Cal. App. 4th 97, 118-20 (2004) (no action based on non-renewal of teacher's contract after refusal to permit weapons search of students); *Espinosa v. City & County of San Francisco*, No. C-11-2282 JSW, 2011 WL 6963094, at *4 (N.D. Cal. Sept. 7, 2011) (no action based on detention of material witnesses); *Creighton v. City of Livingston*, 628 F. Supp. 2d 1199, 1205-07, 1216-18 (E.D. Cal. 2009) (no action based on termination of public employee for whistleblowing regarding environmental hazard).[7]  The burden is

---

[7]  Other cases have declined to employ the *Katzberg* analysis on the basis that the parties did not present the court with sufficient information (*see, e.g., Cuviello v. Cal Expo*, No. S-11-2456 KJM, 2012 WL 4208201, at *11 (E.D. Cal. Sept. 19, 2012); *Bolbol v. Feld Entertainment, Inc.*, No. C-11-5539 PSG, 2013 WL 257133, at *5 (N.D. Cal. Jan. 23, 2013); *Adams v. Kraft*, No. C-10-0602 LHK, 2011 WL 3240598, at *16 (N.D. Cal. July 29, 2011)) or simply concluded that no private right

1    on the Plaintiffs to demonstrate a private right of action exists here.  *Cf. Burnham v. Cal. Public*

2    *Employees' Retirement System*, 208 Cal. App. 4th 1576, 1588 (2012) ("As the appellant, [the

3    plaintiff] bears the burden of persuading us she is entitled to the remedy she seeks."); *Crusader Ins.*

4    *Co. v. Scottsdale Ins. Co.*, 54 Cal. App. 4th 121, 133 (1997) (burden of demonstrating statute creates

5    a private right of action).

6         In this case, Plaintiffs have not demonstrated why the Court should find a private right of

7    action under the *Katzberg* factors.  In their opposition brief, Plaintiffs simply argue that recognition

8    of a private right of action for damages would not create adverse policy consequences because such

9    an award already exists under § 1983.  Pls.' Opp'n 25-26.  However, this conclusion falls short of

10   the analysis necessitated by *Katzberg*.

11        Here, for instance, as for the first *Katzberg* factor, it appears that Plaintiffs *do* have adequate

12   alternative remedies because, as discussed further below, they may bring a claim under article I,

13   section 2(a) of the California Constitution in their sixth cause of action brought pursuant to

14   California Civil Code section 52.1.

15        As for the second *Katzberg* factor, recognizing a constitutional tort for violation of article I,

16   section 2(a) based on these facts would appear to significantly change established tort law by

17   expanding government liability for actions taken to regulate demonstrations.  Plaintiffs have not

18   suggested any tort that would appear to cover the same conduct.  Rather, Plaintiffs only refer to §

19   1983, albeit for an argument arising under the fourth prong of the *Katzberg* test.  *See* Pls.' Opp'n 26.

20   However, as several courts have recognized, the second *Katzberg* prong looks to established

21   *California* tort law, not federal law.  *See, e.g.*, *Reinhardt v. Santa Clara County*, No. C-05-5143

22   HRL, 2006 WL 662741, at *8 (N.D. Cal. Mar. 15, 2006) (looking to "established tort law in

23   California"); *Millender v. County of Los Angeles*, No. C-05-2298 DDP, 2007 WL 7589200, at *39

24   (C.D. Cal. Mar. 15, 2007) *reversed on other grounds by* 472 Fed. Appx. 627 (9th Cir. 2012) (same);

25   *Smith v. County of Riverside*, No. C-05-512 VAP, 2006 U.S. Dist. LEXIS 98213, at *19 (C.D. Cal.

26   May 16, 2006) (same).

27

28   _____

of action based on article I, section 2(a) of the California Constitution exists (*see, e.g.*, *Brahmana v. Henard*, No. C-10-1790 JW, 2011 7293390, at *8 (N.D. Cal. Mar. 23, 2011)).

United States District Court
For the Northern District of California

1    As neither the first nor the second *Katzberg* factor militate in favor of recognizing a

2    constitutional tort, the importance of the free speech right (the third factor) outlined in article I,

3    section 2(a) of the California Constitution "is not a factor of great significance."  *See Degrassi*, 29

4    Cal. 4th at 343.

5    To be sure, Plaintiffs argue in conclusory fashion that no adverse policy consequences would

6    obtain were damages awarded here (in contrast to the chilling effect on the political process at issue

7    in *Degrassi*) because damages are already available under § 1983.  But Plaintiffs overlook the

8    difference in constitutional standards between the First Amendment and article I, section 2(a).  Nor

9    do Plaintiffs address the fact that where the first two *Katzberg* factors do not militate in favor of

10   recognizing a constitutional tort, the Court "need not consider, in addition, whether any special

11   factors would counsel hesitation in recognizing such a damages action."  *Katzberg*, 29 Cal. 4th at

12   329.  Thus, although a different result might obtain were a better showing made, in this case based

13   on the showing made by Plaintiffs herein, the Court **GRANTS** Defendants' motion to dismiss

14   Plaintiffs' third cause of action to the extent it seeks monetary damages.  It does so with prejudice.

15   Plaintiffs' complaint does not specify whether they seek other forms of relief.  *See* FAC,

16   Docket No. 52, ¶¶ 110-12.  Article I, section 2(a) *does* support a cause of action for declaratory or

17   injunctive relief.  *See Degrassi*, 29 Cal. 4th at 338.  If Plaintiffs wish to pursue a claim for injunctive

18   or declaratory relief, they should so state upon amending their complaint.

19   E.    Facial and As-Applied Challenge to Section 7.08(d) (Fourth Cause of Action)

20   Plaintiffs withdraw their facial challenge to section 7.08(d).  Pls.' Opp'n, Docket No. 67, at

21   3:3-5.  Defendants do not contest Plaintiffs' as-applied challenge to section 7.08(d).  Defs.' Mot.,

22   Docket No. 62, at 1:25-27.  However, Plaintiffs' counsel conceded at the hearing in this matter that

23   their as-applied challenge to section 7.08(d) is subsumed under their first cause of action under §

24   1983 or their third cause of action under the California Constitution.  *See* Hr'g Tr. 22:11-23:10.

25   Their fourth cause of action is entirely redundant of those causes of action.  Thus, the Court strikes

26   Plaintiffs' fourth cause of action pursuant to Federal Rule of Civil Procedure 12(f)(1), which permits

27   a Court to strike redundant matters *sua sponte*.

28

United States District Court

For the Northern District of California

F.   Facial and As Applied Challenge to Section 7.15 (Fifth Cause of Action)

The Court has considered Plaintiffs' facial and as-applied challenge to section 7.15 in the context of their § 1983 cause of action.  Thus, the Court need not separately consider Plaintiffs' fifth cause of action.  Because Plaintiffs' fifth cause of action appears to overlap substantially with their first cause of action brought pursuant to § 1983, it is stricken as redundant.  As Plaintiffs have already been granted leave to amend their complaint, the Court will allow Plaintiffs to clarify the distinction, if any, between these two causes of action in their next amended complaint."  If this claim is subsumed under § 1983 (and possibly Art. I, § 2(a)), it should not be reasserted.

G.   Violation of California Civil Code Section 52.1 (Sixth Cause of Action)

Plaintiff's sixth cause of action is for violation of California Civil Code section 52.1 ("the Bane Act" or "section 52.1").  *See* FAC, Docket No. 52, ¶¶ 126-28.

1.   Statement of Law

The Bane Act prohibits interference or attempted interference with a person's rights under federal or California law by "threats, intimidation, or coercion."  Cal. Civ. Code § 52.1(a).  Threat of arrest suffices to demonstrate "threats, intimidation, or coercion" under the Bane Act.  *See Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084, 1103-04 (N.D. Cal. 2005).  California courts have recognized that an arrest without probable cause may constitute a Bane Act violation in and of itself.  *See Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1050 (2007); *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004).

Defendants' primary argument here is that the requisite showing of threats, intimidation, and coercion is not met here.  They cite *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012), for the proposition that, "where coercion is inherent in the constitutional violation alleged, i.e., an over-detention in County jail, the statutory requirement of 'threats, intimidation, or coercion' is not met."

In *Shoyoye*, the plaintiff was lawfully arrested and ordered released three days later, but then held over an additional sixteen days as a result of a county employee's inadvertent error.  *Id.* at 951.  Plaintiff sued claiming the unauthorized detention violated his constitutional rights and that the detention was obtained through coercion by the jail authorities in keeping him in jail.  The *Shoyoye*

**United States District Court**

For the Northern District of California

1    court held that, "where coercion is inherent in the constitutional violation alleged, . . . the statutory

2    requirement of 'threats, intimidation, or coercion' is not met" only after determining that there was

3    no *intentional* interference with a constitutional right.  *See id.* at 958-59.  Its discussion regarding the

4    necessity of coercion beyond that inherent in the wrongful detention of the plaintiff came in

5    response to the plaintiff's argument that even *absent* an intentional interference with his rights, the

6    act of forced continued detention itself satisfied the coercion requirement of the Bane Act.  Thus,

7    *Shoyoye* does not diminish the holdings in *Gillan* and *Venegas*, which recognized Bane Act claims

8    for arrest without probable cause where the arrest constituted *intentional* interference of the

9    plaintiff's rights through use of force.  Moreover, *Shoyoye* applies only where the right at issue

10   inherently entails freedom from coercion (such as false imprisonment).

11           2.      Application

12           Plaintiffs' complaint identifies six different sub-claims they seek to assert pursuant to section

13   52.1: (1) their right to freedom of speech based on (a) the First Amendment and (b) article I, section

14   2(a) of the California Constitution; (2) their right to equal protection of the law based on (a) the

15   Fourteenth Amendment and (b) article I, section 7(a) of the California Constitution; and (3) their

16   right to be free from illegal arrest based on (a) the Fourth Amendment and (b) article I, section 13 of

17   the California Constitution.  FAC, Docket No. 52, ¶ 127.  Plaintiffs allege that Defendants interfered

18   with these rights through coercion, by physically pulling down Plaintiffs' banner while Plaintiffs

19   were holding it and preventing Plaintiffs from displaying their banner, and through threat, by forcing

20   Plaintiffs, under threat of arrest, to demonstrate in an arbitrarily construed "free speech area."  *See*

21   Compl., Docket No. 52, ¶¶ 35-36.

22           Plaintiffs' Bane Act claims based on violation of free speech are adequately alleged.

23   Defendants threatened them with arrest if they were to protest outside of the "free speech area,"

24   which, as discussed above, for purposes of the instant motion violated Plaintiffs' free speech rights.

25   Also, Defendants' tearing down of Plaintiffs' banner constituted sufficient coercion which allegedly

26   interfered with Plaintiffs' freedom of expression.  The alleged conduct of Defendants thus involved

27   *intentional* interference with First Amendment rights.  Moreover, First Amendment rights do not

28   inherently involve freedom from coercion.  The First Amendment may be violated, *e.g.*, by refusal to

United States District Court
For the Northern District of California

1  issue a permit. *See, e.g.*, *U.S. v. Baugh*, 187 F.3d 1037, 1043 (9th Cir. 1999) ("even if the regulation

2  on its face created reasonable time, place, and manner constraints, the Park Service

3  unconstitutionally applied the requirement when it refused to issue a permit for any expressive

4  activity in this case"). *Shoyoye* is inapposite.

5  However, for the reasons stated above, Plaintiffs' equal protection theory claims fail as

6  Plaintiffs have not alleged sufficient facts demonstrating that Defendants interfered with their right

7  to equal protection under the law.  Nor have Plaintiffs alleged facts showing that Defendants

8  intentionally interfered with Plaintiffs' right to equal protection through threats, intimidation, or

9  coercion.

10  Lastly, Plaintiffs have not pled facts supporting a Bane Act sub-claim on the basis of their

11  right to be free from unlawful arrest. For one, as discussed in the context of their § 1983 cause of

12  action, they have not shown interference with their right to be free from unlawful arrest, as they

13  were never seized.  In addition, Plaintiffs have not even alleged that Defendants *attempted* to subject

14  them to unlawful arrest, but rather that they only threatened Plaintiffs with arrest.  While a threat of

15  arrest may interfere with First Amendment rights, a threat of false arrest does not constitute a Bane

16  Act violation of Plaintiffs' right to be free from false arrest.  Absent an arrest, no right to be free

17  from false arrest was violated.

18  In sum, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' sixth cause of action

19  to the extent it is based on theories of equal protection and unlawful arrest, and **DENIES** the motion

20  to dismiss Plaintiffs' sixth cause of action to the extent it is based on freedom of speech.  The

21  Court's dismissal of Plaintiffs' equal protection theory is without prejudice; dismissal of the

22  unlawful arrest theory is with prejudice and without leave to amend.

23  H.  Taxpayer Suit to Enjoin Illegal Expenditure of Funds (Seventh Cause of Action)

24  Defendants argue that Plaintiff Felsinger, who is the only Plaintiff asserting the seventh

25  cause of action, lacks standing to state a claim to enjoin illegal expenditure of funds pursuant to

26  California Code of Civil Procedure section 526a ("section 526a").  Defs.' Mot. 24-25.  Plaintiffs did

27  not contest this argument in their opposition brief, but asserted at the hearing in this matter that they

28  do not wish to waive their right to pursue this cause of action.  However, this cause of action, which

1  only seeks injunctive relief, suffers from the same basic fault as Felsinger's standing to enjoin

2  section 7.15; Felsinger is a resident of the State of Oregon and therefore does not have standing to

3  bring a taxpayer suit for injunctive relief regarding expenditure of San Francisco's local tax dollars.

4  FAC ¶ 9.

5       With respect to claims brought under section 526a, "a party seeking to commence suit in

6  federal court must meet the stricter federal standing requirements of Article III." *Cantrell v. City of*

7  *Long Beach*, 241 F.3d 674, 683 (9th Cir. 2001). As discussed above, Felsinger is still subject to the

8  requirement that he show some sufficiently real threat of future injury in order to have standing. *See*

9  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc).

10  Felsinger has not shown such a likelihood. He resides in Oregon and has not alleged he has any

11  "concrete plans" to move to San Francisco, a prerequisite to have standing to seek taxpayer

12  injunctive relief herein. *See id.* Thus, Plaintiffs' seventh cause of action fails. The Court **GRANTS**

13  Defendants' motion to dismiss it. The Court dismisses this cause of action without prejudice and

14  with leave to amend.

## V.   CONCLUSION

16       In sum, the Court dismisses the following claims with prejudice and without leave to amend:

17  •   Plaintiffs' Fourth Amendment excessive force sub-claim.

18  •   Plaintiffs' third cause of action brought pursuant to article I, section 2(a) of the

19      California Constitution to the extent it seeks monetary damages.

20  •   Plaintiffs' Bane Act claims based on unlawful arrest.

21       On the other hand, the Court dismisses the following claims without prejudice and with leave

22  to amend:

23  •   Plaintiffs' claims for prospective and injunctive relief regarding section 7.15. This

24      dismissal encompasses Plaintiffs' entire facial challenge to section 7.15 and any

25      prospective relief sought by Plaintiffs' as-applied challenge to section 7.15.

26  •   Plaintiffs' First Amendment viewpoint discrimination sub-claim as against the City.

27  •   Plaintiffs' claim against the City for tearing the banner down to the extent

28      enforcement by the Officers was of the 20 feet by 20 feet free speech area.

1    • Plaintiffs' claim against the City for the Officers' threats to cite and arrest Plaintiffs

2        for violating the 20 feet by 20 feet free speech area if enforcement was based on

3        section 7.08(d) or the second provision of section 7.15.

4    • Plaintiffs' First Amendment time, place, or manner sub-claim as against Yu to the

5        extent he was attempting to enforce section 7.15 in threatening to cite and arrest

6        Plaintiffs for leaving the 20 feet by 20 feet free speech area.

7    • Plaintiff's First Amendment time, place, or manner sub-claim as against Yu and

8        Mitra to the extent the tearing down of Plaintiffs' banner and the citation of Plaintiffs

9        derived from the Officers' enforcement of section 7.08(d)'s prohibition on

10       demonstration in the western half of Union Square.

11   • Plaintiffs' Fourth Amendment unlawful seizure sub-claim.

12   • Plaintiffs' Fourteenth Amendment equal protection sub-claim.

13   • Plaintiffs' second cause of action for conspiracy.

14   • Plaintiffs' Bane Act claims based on equal protection.

15   • Plaintiffs' seventh cause of action for illegal and wasteful expenditure of funds.

16   The Court also strikes as redundant Plaintiffs' fourth and fifth causes of action bringing facial and

17   as-applied challenges to section 7.08(d) and section 7.15.

18       Following this Order and the parties' concessions, only the following claims remain:

19   • Plaintiff's First Amendment viewpoint discrimination sub-claim as against the

20       Officers.

21   • Plaintiffs' First Amendment time, place, or manner sub-claim as against the City to

22       the extent it is based on Defendant Yu's threat of citation with the first provision of

23       section 7.15, the Officers' tearing down of Plaintiffs' banner pursuant to section

24       7.08(d), and Plaintiffs' citation pursuant to proper enforcement of section 7.08(d).

25   • Plaintiffs' First Amendment time, place, or manner sub-claim as against Officer Yu

26       to the extent his threats of citation and arrest if Plaintiffs demonstrated outside the 20

27       feet by 20 feet free speech area were based on misapplication of section 7.08(d).

28   • Plaintiffs' First Amendment time, place, or manner sub-claim as against Officers Yu

and Mitra to the extent their tearing down Plaintiffs' banner and citation constituted a

misapplication of section 7.08(d) in enforcing the 20 feet by 20 feet free speech area.

    •    Plaintiffs' Bane Act sub-claims based on freedom of speech.

Plaintiffs are advised that, in amending their complaint, they should not re-assert the claims dismissed without prejudice unless they have a basis for doing so consistent with Federal Rule of Civil Procedure 11.  In addition, Plaintiffs may not add additional claims not addressed by this Order without seeking prior leave of Court.  Plaintiffs may amend their complaint within thirty days of the date of this order if they so choose, otherwise the Court will dismiss with prejudice those claims dismissed without prejudice herein.

This order disposes of Docket No. 62.


IT IS SO ORDERED.


Dated:  April 15, 2013

_____
EDWARD M. CHEN
United States District Judge